**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

    v.                                                  Criminal Action No. 3:14-CR-07-01

**DERWIN LEE HARRIS,**

    **Defendant.**

**REPORT AND RECOMMENDATION THAT DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE [31] BE DENIED**

**I. INTRODUCTION**

This matter comes before the Court on Defendant Derwin Lee Harris' Motion to Suppress Evidence. (Def.'s Mot., Apr. 1, 2014, ECF No. 31). On April 15, 2014, the United States of America (hereinafter, "the Government") filed its response to Defendant's Motion. (Resp., April 15, 2014, ECF No. 34). On May 6, 2014 the Court held an evidentiary hearing and argument on Defendant's Motion. Defendant appeared in person and by counsel, Matthew T. Yanni, Esquire. The Government was present by Paul T. Camilletti, Assistant United States Attorney, appearing on behalf of Jared J. Douglas. At the hearing, the Government presented the testimony of Sergeant Craig Phelps and Corporal Justin Harper from the Martinsburg City Police Department. Defendant presented the testimony of the co-defendant in this case, Lamarcus Lashawn Robinson, Defendant's nephew. The Court admitted as Defendant's Exhibit One the search warrant for the Days Inn hotel room, Corporal Harper's affidavit in support of the warrant and the property receipt for items seized form the traffic stop on July 7, 2013. The Court also admitted Defendant's Exhibit Two, a receipt from AutoTouch Automotive noting the completion

of a routine car inspection of a 1999 Dodge Intrepid. No additional testimony or other evidence was presented.

### A. Background

Defendant is charged in a six (6) count indictment plus forfeiture allegation related to the distribution of controlled substances at or near Martinsburg, West Virginia along with one other co-defendant, Lamarcus Lashawn Robinson. Count One charges Defendant and Robinson with Drug Conspiracy to possess with intent to distribute and to distribute cocaine base, heroin and cocaine. Counts Two to Five charge Defendants with aiding and abetting possession with intent to distribute cocaine base, cocaine and heroin on July 7, 2013. Count Six charges Defendant with Possession of Firearms in Furtherance of Drug Trafficking Crime on May 10, 2013. Specifically, the indictment charges Defendant Harris with possessing two .38 caliber firearms in furtherance of the drug trafficking crimes in Counts 1 through 5.

### B. The Motion

1. Motion to Suppress Evidence (ECF No. 31).

### C. Recommendation

I recommend that Defendant's Motion to Suppress Evidence [31] be **DENIED** because the undersigned finds Sgt. Phelps' testimony that a broken license plate light prompted the traffic stop to be credible. Thus, the traffic stop was lawful.

## II. FACTS

At approximately 1:15 a.m. on July 7, 2013, Sgt. Craig Phelps of the Martinsburg Police Department conducted a traffic stop of a vehicle with a "blown registration light." Defendant was the driver and registered owner of the vehicle; co-defendant Lamarcus Robinson sat in the front passenger side seat. Sgt. Phelps previously saw the car driving around Martinsburg, West Virginia twice in the previous hour; once circling the Days Inn on Viking Way and the second

time in the 600 block of S. Queen Street. After pulling the car over and making contact, neither Harris nor Robinson could immediately provide identification or registration for the car. Sgt. Phelps noted that Harris appeared "very nervous and kept repeating himself."

When Sgt. Phelps asked passenger Robinson to produce identification, Mr. Robinson began searching the center console in the car. At this time, Sgt. Phelps observed a "small clear plastic bag [in the console] that Robinson seemed to be trying to hide from my view." Sgt. Phelps also observed a "brown paper bag sticking out of [Harris'] left front pants pocket." Both individuals were "acting very nervous" so Sgt. Phelps requested back up. While engaging the individuals in conversation, Robinson stated that he and Harris were related and he was staying at the Days Inn with his twelve year old son. He commented that they had been out fishing and fishing poles were in the trunk.

After Cpl. Harper arrived as back up, Sgt. Phelps asked Harris to step out of the car and received consent to search his person. The brown paper bag was not found in his pocket. When asked, Harris "feigned ignorance about it." When asked if there was anything in the car that he should not have, Harris stated that "the brown bag was left in the car by a prostitute that was in the car earlier." When asked what was in the bag, Harris stated there were drugs in the bag. Based on this information, Sgt. Phelps began a search of the vehicle. Harris was placed in handcuffs and placed in Cpl. Harper's patrol car. Robinson was placed in handcuffs and seated next to the car.

During the search of the vehicle, officers found various contraband. Officers located the brown paper bag "shoved under the left side of the driver's seat with a small portion still sticking out." The bag contained a crack pipe and some Chore-Boy scouring pads. The clear plastic bag observed in the center console contained a small amount (1.1 grams) of marijuana. On the

passenger side of the car, officers located two small plastic bags and four small glass vials containing suspected crack cocaine (approximately 1.4 grams). Officers also located $1,584.00 on Robinson's person. Hotel room keys were also found in the vehicle, which Robinson indicated were his. Robinson and Harris were placed under arrest at this time and transported to the police station for processing.

Officers proceeded to the Days Inn hotel room where Robinson reported his twelve year old son was staying. Officers knocked several times but no one answered. None of the keys opened the door. Cpl. Harper then completed a search warrant for the hotel room. In the affidavit for the search warrant, Cpl. Harper needed to list the reason for the traffic stop. He contacted Sgt. Phelps and believed he heard Sgt. Phelps say the stop was for a broken tail light not a broken registration light. In the affidavit, Cpl. Harper thus listed that the vehicle was stopped because Sgt. Phelps had witnessed the car "driving with a defective tail light."

Meanwhile, back at the police station, Sgt. Phelps was speaking to Robinson about his son when Defendant "blurted out that he had a substantial quantity of illegal narcotics inside the room." The affidavit submitted with the search warrant indicates that Harris "exclaimed in an excited utterance that there was an ounce to an ounce and one half of "rock" which is the street term for crack cocaine, an ounce of 'powder' which is the street term for powder cocaine, and 'a bunch' of weed in the hotel room and that it all belonged to him." At this time, the search warrant was adjusted to include the illegal narcotics. The warrant was presented and signed by a State Magistrate. Officers executed the search warrant on the hotel room. As officers attempted forced entry into the hotel room, Robinson's son came to the door; the child was placed in custody of Child Protective Services.

During the search of the room, additional narcotics were found. Officers located a bag on the back of toilet containing 25.556 grams of powder cocaine. Cpl. Harper also located a digital scale in close proximity "along with random chunks of suspected cocaine on a towel on the floor." A black duffle bag was located in the front room on an ironing board, which contained a white plastic box with 3.324 grams of black tar heroin, 14.529 grams of crack cocaine, three small glass vials containing 0.497 grams of crack cocaine, one unmarked prescription bottle with 59 ¼ Xanax pills, and several empty glass vials. On the far bed in the room, officers found an unloaded .38 caliber revolver under the pillow. Right behind the handgun in between the mattress and the wall was a large plastic bag containing 81.7 grams of suspected marijuana. An additional $105.00 in currency was located in a pair of shorts by the window. Officers further located "numerous other packing and implements used in packaging and distribution of illegal narcotics" as well as several cell phones. Later in the afternoon, Cpl. Butcher responded to a request from the Days Inn. Upon arrival, hotel staff informed Cpl. Butcher that cleaning stuff had found a second handgun, a .38 caliber revolver, wrapped in a bed sheet.

### III. MOTION TO SUPPRESS PHOTOGRAPHIC IDENTIFICATION

*A. Contentions of the Parties*

Defendant requests the Court "suppress any and all evidence obtained during and after the stop of the vehicle driven by Derwin Harris." (Def.'s Mot. to Suppress Evidence, ECF No 31 at 1). Defendant asserts that Sgt. Phelps "did not have 'probable cause or a reasonable suspicion, based upon specific and articulable facts of unlawful conduct.'" (*Id.*) (citing *United States v. Johnson*, 256 F.3d 214, 215 (4th Cir. 2001) (quoting *United States v. Wilson*, 205 F.3d 720, 722-23 (4th Cir. 2000)). Defendant argues that all evidence should be suppressed because it is tainted by a violation of Harris' rights under the Fourth Amendment. (*Id.*).

In support of his motion, Defendant argues there is no tangible evidence supporting Sgt. Phelp's contention that the registration light was in fact defective, which led to the initial traffic stop. (Def.'s Mot. to Suppress Evidence, ECF No. 31 at 5). Defendant points to the fact that "Sgt. Phelps and Cpl. Harper provided different reasons for seizing the vehicle, 'blown registration light' and 'defective tail light,' respectively." Defendant also called Lamarcus Robinson as a witness who testified that he had taken the car for a routine inspection just two days prior to the traffic stop and the car passed inspection. Defendant argues that because the officer's vehicle cameras were not working, no photographs were taken, and the car was subsequently disposed of by the towing company, there is no tangible evidence supporting the Government's contention that probable cause or reasonable suspicion existed for the officer's initial traffic stop.

The Government contends that "the undersigned has been unable to find any case law standing for the proposition that the United States must present 'tangible evidence' of the reason for a traffic stop to defeat a suppression motion." (U.S. Opp'n to Def.'s Mot. to Suppress, ECF No. 34 at 7). The Government further argues that "this lack of case law is not surprising because such a proposition is illogical." The Government states that an officer does not need to capture an illegal traffic violation on video or take a photograph of the violation in order to later provide "tangible evidence to defeat a suppression motion for drugs later found in the vehicle." Further, the Government argues that Cpl. Harper "mistakenly stated the equipment violation was for a 'defective tail light'" rather than the "blown registration light" as reported by Sgt. Phillip, who initially pulled over Defendant's car. (Opp'n to Def.'s Mot., ECF No. 34 at 7). The Government states, "[s]omething nefarious is not afoot…[i]nstead a simple mistake was made in good faith." (*Id.* at 7-8).

B. *Discussion*
   1. **Legal Standard for Search and Seizure during Traffic Stop**

When a police officer stops an automobile and detains the occupants briefly, the stop amounts to a seizure within the meaning of the Fourth Amendment. *See United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011) (citing *Whren v. United States*, 517 U.S. 806, 809–10, 116 S. Ct. 1769 (1996)); *see also United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744 (2002) (noting that the Fourth Amendment's protection against "unreasonable searches and seizures" extends to "brief investigatory stops of persons or vehicles"). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810. Moreover, "any ulterior motive a police officer may have for making the traffic stop is irrelevant." *Id*. at 813; *see also Ohio v. Robinette*, 519 U.S. 33, 39, 117 S. Ct. 417 (1996) (noting that reasonableness under the Fourth Amendment is evaluated objectively).

When analyzing the validity of a traffic stop, the court applies the standard set for in *Terry v. Ohio* "[b]ecause a traffic stop is more analogous to an investigative detention than a custodial arrest." *See United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011) (citing *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868 (1968). The standard in *Terry* directs the court to "'analyze the propriety of a traffic stop on two fronts. First, we analyze whether the police officer's action was justified at its inception.' Second, we analyze whether the police officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop." *Id.* (citing *Digiovanni*, 650 F.3d at 506; *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir.1992)).

The Fourth Circuit has stated that "[o]bserving a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." *United States v. Branch*, 537 F.3d 328, 332

(4th Cir. 2008). Once witnessing a traffic violation, police may develop "a 'reasonable suspicion' of ongoing criminal activity that justifie[s] extension of the traffic stop." *Id.* "Thus, a prolonged automobile stop requires either the driver's consent or a 'reasonable suspicion' that illegal activity is afoot." *Id.* at 336 (internal citations omitted). Moreover, *Terry's* "reasonable suspicion" standard is "less demanding ... than probable cause." *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S. Ct. 673 (2000).

## 2. Evidence of Vehicle's Minor Equipment Violation

In the present case, the Government presented the testimony of Sgt. Craig Phelps and Cpl. Justin Harper from the Martinsburg City Police Department. Sgt. Phelps testified that he first observed the car at the Days Inn circling the parking lot. He noticed at this time that the car's registration light was not working. However, he chose not to initiate a traffic stop at this time because he did not perceive the violation as egregious. Later that night when he saw the vehicle driving around town, he again noticed the blown registration light and chose to pull over the car for the violation at that time.

Mr. Robinson testified that he did not recall being told the reason for the traffic stop when Sgt. Phelps first approached the car. Cpl. Harper testified that he did not recall being told the reason the car was initially pulled over and he did not look for or observe the blown registration light when he arrived on the scene. Cpl. Harper stated that he first learned about the reason for the traffic stop when he was completing the affidavit in support of the search warrant. He testified that when he asked Sgt. Phelps for the reason behind the stop, he heard Sgt. Phelps say a blown "tail light," which is what he wrote in the affidavit. Cpl. Harper believes there was a miscommunication because officers colloquially refer to registration plate lights as "tag lights," which he misheard as "tail light." Both officers testified that the cameras in their vehicles did not record the stop because the computer system used to operate the cameras was being upgraded at

that time. Following the stop, the vehicle was towed by All American Towing. Despite attempts to return the car to Defendant, the 90 day period elapsed and the towing company disposed of the vehicle. Therefore, the only evidence in support of the traffic stop being for a blown registration light is from Sgt. Phelp's police report, Sgt. Phelp's testimony, and Cpl. Harper's testimony and affidavit in support of the search warrant in which he mistakenly refers to the blown registration light as a broken tail light.

Defendant presented the testimony of co-defendant, Lamarcus Robinson, who was in the passenger seat at the time of the traffic stop. Robinson testified that he had previously purchased the vehicle from Defendant and had driven the car to Martinsburg from his home in Philadelphia for a fishing trip. Prior to his departure, he took the car to the mechanic to fix the air conditioner and to have a routine inspection completed. The car passed the inspection, which indicates that the registration plate light should have been in working condition. Robinson testified that when he picked up the car from the mechanic on July 5, 2013, he walked around the car inspecting the vehicle and did not see any broken lights.

The Court admitted Defendant's Exhibit two, a receipt from AutoTouch Automotive in Philadelphia, Pennsylvania. Mr. Robinson explained that the receipt was printed on April 20, 2014 because he could not find his original receipt so he returned to the mechanic on that date and requested another copy of his receipt for the work completed on July 5, 2013. The April date is crossed off on the receipt and "7/5/13" is hand-written in pen. The receipt appears to be signed and dated, 7/15/13, in the same handwriting. Mr. Robinson testified that he did not write the corrected date, 7/5/13, on the receipt. The receipt lists the vehicle as a 1999 Dodge Intrepid, which Defendant explained must be a mistake or typographical error because his car is a 2004 Dodge Intrepid.

### 3. Credibility of Officer's Testimony for Making Traffic Stop

Failure to have a working rear registration plate is a traffic violation in West Virginia. Pursuant to W.Va. Code § 17C-15-5(c), "[e]ither a tail lamp or a separate lamp shall be so constructed and placed as to illuminate with a white light the rear registration plate and render it clearly legible from a distance of fifty feet to the rear." Neither party contested that a broken registration light – or a broken tail light – constitutes a traffic violation in West Virginia.

The undersigned has not found any case law requiring the Court to grant a motion to suppress when there is an absence of tangible evidence, such as a photograph or video footage, documenting the alleged traffic violation underlying a traffic stop. Therefore, at issue is the credibility of Sgt. Phelps and Cpl. Harper's testimony that there was a minor equipment violation justifying the traffic stop, particularly in light of Mr. Robinson's testimony and the receipt indicating that the vehicle recently passed inspection and the car's lights were not broken.

Case law supports an inquiry into the credibility of officers' testimony regarding the underlying justification for a traffic stop. In *United States v. Gaines*, the Fourth Circuit affirmed the district court's order granting defendant's motion to suppress evidence stemming from an unlawful traffic stop based on a crack on the windshield of the vehicle. *United States v. Gaines*, 668 F.3d 170, 171 (4th Cir. 2012). The district court stated that the stop was not support by reasonable suspicion and was thus unlawful because "the court declined to credit the testimony" of officers making the stop. *Id.* at 172. The district court found that one officer "could not see the crack from the rear seat, across an intersection, through the tinted rear window [of the car] as the [car] turned right, away from the officer." *Id.* The district court further discredited the testimony of two other officers who said they saw the crack in the windshield. *Id.* The Government conceded that the traffic top was unlawful on appeal. *Id.*

In *Ellington*, the district court also discredited the officers' testimony that the defendant's car had a broken brake light and cracked windshield. *United States v. Ellington*, 396 F. Supp. 2d 695, 700 (E.D. Va. 2005). Two officers testified that they saw a broken center brake light; one officer testified that he did not see the broken brake light. *Id.* However, "defendant's father, who took custody of the car after the incident, testified that all the lights were in working order, and that an inspection had been undertaken, at defense counsel's request, that verified that fact." *Id.* The chief inspector and supervisor at Ron's Auto also "testified that when he inspected [the defendant's] car he found 'all the rear tail lights to be in proper working order.'" *Id.* Based on this evidence, the district court found that "government has failed to show that the center brake light was non-functioning." *Id.* The court explained that the officers made an unreasonable mistake in believing the brake light was broken and conducting the traffic stop. *Id.* at 701 (stating that "the standard is not whether the brake light was actually non-functioning, but rather whether the officers made a reasonable mistake in believing that the center brake light was non-functioning, the Court must ask whether the government has demonstrated by a preponderance of the evidence that the officer's mistake was reasonable.").

Similarly in *Carmichael,* the district court found that the officer lied regarding the brake light malfunction underlying the traffic stop. *Carmichael v. Vill. of Palatine, Ill.*, 605 F.3d 451, 455 (7th Cir. 2010). The court found that the officer "testified that the car had been stopped because it did not have functioning tail or brake lights," which contradicted his previous testimony that the car had been stopped "because of the window tint or front license plate issues." *Id.* Moreover, "[a]n investigator employed by Mr. Carmichael's attorney had gone to the shop and had examined the vehicle; he testified that he had found its taillights to be operational."

*Id.* Based on this evidence, the court found the officer's testimony not to be credible and granted defendant's motion to suppress. *Id.*

Unlike the above cases, in *McGee*, the Fourth Circuit affirmed the district court's denial of defendant's motion to suppress. *United States v. McGee*, 736 F.3d 263, 271 (4th Cir. 2013) *cert. denied*, 134 S. Ct. 1572 (2014). The officer testified he observed a broken center brake light. *Id.* at 268. The defendant claimed his rental car did not have a defective light. *Id.* The defendant presented the testimony of an investigator with the Federal Defender's office who tracked down the rental car five months after the stop and "tested the brake lights and found them to be fully functional." *Id.* An employee of Enterprise Rent-a-Car, who rented the car to the defendant, also testified that "it was customary for Enterprise to keep a record of all complaints and repairs made on any vehicle; there was no record of any complaints about the defective brake light or any repair for a defective brake light after the stop in July 2011." *Id.* The district court denied the motion to suppress even though the government was relying exclusively on the testimony of the officer. *Id.* at 276 (holding that that "[a]lthough Defendant's evidence raises a serious factual issue, it is ultimately insufficient to overcome Officer Halstead's direct and unimpeached testimony that the Avenger's center brake light was indeed nonoperational on July 26, 2011."). In affirming the district court, the Fourth Circuit stated that "[a]though McGee's evidence that the brake light was not inoperative is significant, it is nonetheless circumstantial and relies on the untested reliability of a third party's recordkeeping." *Id.* at 271.

Here, the undersigned finds that Sgt. Phelps testimony that he observed a broken registration light to be credible. His testimony during the evidentiary hearing aligned with his police report completed following the incident. He did not waiver in his belief that the registration light was broken at the evidentiary hearing. Moreover, Cpl. Harper provided

sufficient justification for the miscommunication in hearing "tail light" rather than "tag light" when completing the affidavit in support of the search warrant. Additionally, the testimony of Mr. Robinson indicating an inspection was completed for a Dodge Intrepid and that he did not observe any broken lights, while significant, fails to counter the testimony of officers Phelps and Harper. Similarly, the receipt indicating a car inspection was completed on July 5, 2013 is "circumstantial and relies on the untested reliability of a third party's recordkeeping." *McGee*, 736 F.3d at 271. The Court is also concerned that the receipt stated a 1999 vehicle not a 2004 vehicle. Finally, and most importantly, there was no witness for the Government to cross examine concerning the alleged inspection. Accordingly, the undersigned finds that the Government met it's burden that Sgt. Phelps conducted the traffic stop based on his observation of a broken registration light.

## IV. **RECOMMENDATION**

I recommend that Defendant's Motion to Suppress Evidence (ECF No. 31) be **DENIED** because the undersigned finds Sgt. Phelps' testimony that a minor equipment violation prompted the traffic stop to be credible and thus, probable cause existed for initiating the traffic stop.

Any party who appears *pro se* and any counsel of record, after being served with a copy of this Report and Recommendation, may file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection by May 13, 2014. A copy of such objections should also be submitted to the District Court Judge of Record. Failure to timely file objections to the Order set forth above will result in a waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

The Clerk of the Court is directed to transmit a copy of this Report and Recommendation to parties who appear *pro se* and any counsel of record, as applicable.

DATED: May 8, 2014

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE